UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN TUCKER,

        Petitioner,

v.                                    Case No. 03-10254
                                    Honorable David M. Lawson

JOHN CASON,

        Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Kevin Tucker, was convicted in October 2000 by a Macomb County, Michigan jury of sexually molesting his daughter in 1996 when she was five years old. Critical to the State's case was medical evidence that the girl's hymen and anal tissue were irregular, which implied that penetration had taken place. But the jury did not hear evidence that the girl's pelvis and vagina were injured in a serious automobile accident that had occurred before the alleged sexual assault was reported and the ensuing examination by the State's physician, whose report was read into evidence at trial. The petitioner, who currently is confined at West Shoreline Correctional Facility in Muskegon Heights, Michigan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that this important defense evidence was not presented due to his trial attorney's constitutionally deficient performance, which resulted in the violation of the petitioner's Sixth Amendment rights. He also alleges that other trial errors deprived him of a fair trial in violation of the Due Process Clause. The respondent opposes the habeas petition on the grounds that some of the petitioner's claims are unexhausted and the other claims are procedurally defaulted or lack merit.

The Court finds that the petitioner properly exhausted the claims presented here in the state courts. The Court also finds that the argument concerning the admission of evidence, to the extend that it raises a federal constitutional issue, is procedurally defaulted. However, the Court believes that one of the petitioners claims of ineffective assistance of counsel requires issuance of the writ: that his trial attorney provided ineffective assistance by failing to obtain medical records that provide an alternative explanation for the victim's injuries. Trial counsel stated at least twice to the jury that the records were important, despite counsel's failure to investigate the contents of those records. The state courts' decisions on this claim applied the incorrect standards and are contrary to clearly established federal law as determined by the Supreme Court. This Court, therefore, will issue a conditional writ of habeas corpus, which will allow the State a reasonable time to retry the petitioner if it chooses.

## I.

The allegations made against the petitioner by his daughter, AT[1], led to a criminal information charging the petitioner with four counts of first-degree criminal sexual conduct. The State charged that the petitioner inserted his penis in the complainant's anus, vagina, and mouth and that he put a pencil in her anus. (Tr. Sept. 29, 2000, at 6). For reasons unclear to the Court, the case went to the jury on charges that the petitioner inserted (1) his penis in the victim's mouth, (2) his penis in the victim's anus, (3) a pencil in the victim's anus, (4) and his finger (not penis) in the victim's vagina. These events were to have occurred sometime during the late summer of 1996, just

---

[1]Federal Rule of Civil Procedure 5.1, which will become effective December 1, 2007, requires that "in an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor . . . a party or nonparty making the filing may include only . . . the minor's initials." Fed. R. Civ. P. 5.1(a). The Court intends to observe the practice intended by the soon-to-be-effective rule amendment.

before AT started kindergarten. However, she did not report the incidents of abuse until August 7, 1999 when AT told her mother, Tracie Bowers, about these things. Tracie Bowers and the petitioner had been married but separated on Christmas Day 1998. Their divorce was finalized on June 9, 1999. The petitioner testified that he had visitation disputes with his ex-wife during this period, and he lost all contact with AT after the allegations of abuse emerged in August 1999.

The evidence at trial also established that AT was in a serious car accident on August 16, 1996, just before she started kindergarten. She was taken to Mt. Clements General Hospital where she was examined briefly. She was subsequently transferred to Children's Hospital in Detroit and remained in a coma for about a month.

The petitioner's main theory at trial was that AT had been sexually abused by someone other than the petitioner, and that AT's mother accused the petitioner because they had recently divorced and were fighting over visitation. However, as the case developed, an alternate theory emerged: that the evidence of genital trauma that was important to the State's case proving sexual abuse in fact was a result of the car accident.

At the preliminary examination, AT testified that just before the car accident, the petitioner "put his private in [her] privates," including her vagina, anus, and mouth. Prelim. Exam. Hr'g Tr. 9, Jan. 18, 2000. She also testified that the petitioner inserted a pencil into her "front private," "[b]etween [her] legs." *Id.* at 11. AT stated that she did not report the incident to her mother because the petitioner threatened to abuse her mother if she told anyone.

AT testified that another incident occurred after the accident. The petitioner asked her to play a game called frog and butterfly. AT was the butterfly. She wore a butterfly costume, and the petitioner tied a rope around her waist and hung her from the ceiling so she swung back and forth.

AT stated that the petitioner was the frog, and he licked the outside of her costume in the chest area. The petitioner was bound over for trial on four counts of criminal sexual conduct testified to by AT.

At trial, AT testified that the petitioner "put his privates in [her] privates." Trial Tr. 64, Sept. 29, 2000. She testified that the petitioner put a pencil "up [her] private," but she did not specify where the pencil was inserted. *Id*. at 68. AT also testified that she once saw her father dressed in women's clothing and wearing make-up. She said he threatened to abuse her mother if she told anyone. AT never testified that the petitioner inserted a finger in her vagina, although AT's uncle on her mother's side, Samuel Sargente, testified that the petitioner admitted putting his fingers in AT's vagina: "He said the only thing he ever did do to his daughter was, he took his two fingers, stuck them in warm water, put them in her vagina to rinse her out, and it was part of her therapy." *Id.* at 141. Mr. Sargente was unaware of any therapy AT needed that would require such treatment.

On cross-examination, AT testified that she wrote a number of letters to her father throughout the period during which her parents were divorcing, which occurred after the alleged sexual abuse. She testified that she had a good relationship with her father, and pictures she drew for him and letters she wrote to him were received in evidence.

Dr. Norma Inocencio, who never testified at trial, apparently examined AT after AT reported the abuse to her mother. Dr. Inocencio concluded in a report that abnormalities in the complainant's genital area were consistent with sexual abuse. These findings were explained to the jury through the testimony of Dr. Jay Eastman over the petitioner's objection. Both Dr. Inocencio and Dr. Eastman work at the Care House of Macomb, an evaluation center for children who may have been sexually abused. Dr. Eastman reviewed Dr. Inocencio's report and stated that his "impression after reading through this report is that the findings that Dr. Inocencio found in her examination are

compatible with sexual abuse."  Trial Tr. 103, Sept. 29, 2000.  He then read aloud from Dr. Inocencio's report and interpreted the report for the jury.  Under questioning by the State, Eastman said:

> A.  What you should see in a child of this age is a smooth edge of the hymen.  What is described here is several places where the hymen has been broken and then healed.  And in healing, instead of a smooth edge, there are notches in it.
> Q.  And through your experience, you find that those notches are consistent with sexual abuse?
> A.  Yes.

*Id.* at 104.  Eastman also testified that Dr. Inocencio's report described deep fissures in the complainant's anus, which are not normally found in a young child.

On cross-examination, defense counsel asked Dr. Eastman about the medical records from the automobile accident:

> Q.  Okay.  You're aware that [AT] was in a serious accident?
> A.  Yes.
> Q.  Okay.  And what were the nature of the injuries in that accident?
> A.  I believe there was a broken leg and I'm not sure of the rest.
> Q.  Did you review the medical records?
> A.  I had a look at them, but I don't recall what they say.
> Q.  All right.  And doing an examination of someone, the young lady in this case, who was involved in a serious accident, would it not be important to examine those records?
> A.  It could be.
> Q.  I mean, for example, if there were an injury to the vaginal area, wouldn't that be significant?
> A.  It could be.
> Q.  When you say, Doctor, it could be, what do you mean?
> A.  If there were a penetrating injury to the vagina, say, the child had straddled something that penetrated into the vagina, that could be important.

*Id.* at 108-09.

The petitioner testified at trial and denied sexually abusing AT or telling Mr. Sargente that he inserted his fingers into AT's vagina.  He testified that the divorce was contentious.  After he

filed a complaint with the Macomb County, Michigan Friend of the Court about visitation, his relationship with AT's mother became even worse.

The petitioner also admitted that he is a cross-dresser and that his wife once saw him wearing a bra. However, he denied that he ever dressed as a woman in front of AT.

The defense presented several other witnesses at trial who testified that the petitioner has a reputation for truthfulness. In addition, Dr. Larry Friedberg, a clinical psychologist, testified that thirty percent of sexual abuse allegations are false. During closing argument, defense counsel argued to the jury that the Dr. Eastman's failure to review the medical records from the car accident called into question the doctor's conclusions.

> And you will remember the testimony regarding the fact that [AT] had had a serious accident. And I asked the doctor, did you review – actually I asked him did the doctor who wrote the report review the accident reports or the medical reports? And the answer was there is no indication in that report that those reports had been reviewed. And I suggest to you might that not be important to review reports? Do we know that something of that nature didn't happen during the course of the accident?

Trial Tr. 39-40, Oct. 2, 2000. In rebuttal, the prosecutor pointed out that no evidence was presented regarding AT's injuries from the car accident even though defense counsel could easily have gotten the records. The prosecutor said:

> Now, defense attempts to show about how the victim was in a serious car accident so maybe something in that car accident may have caused her hymen to be missing and deep anal fissures. Well, I'm not certain what kind of car accident that would be, however, defense has the exact same subpoena powers as the prosecution as you can tell, because they called witnesses as well, and there was not one doctor that got on that stand that said when [AT] was in this car accident she was penetrated by something. There is no evidence to say that. The only evidence to say that she was penetrated is the evidence of [AT]'s testimony that she was penetrated by her father sexually. To go from there to some sort of car accident mishap is a quantum leap that this jury should not make.

*Id*. at 44-45.

The jury submitted at least four notes to the trial court during its deliberations. In the first note, the jury requested a copy of the charges, a transcript of the complainant's testimony, and an elaboration of the complainant's testimony about something that happened in the basement of her home. The trial court provided the jurors with a copy of the jury instructions and stated that the jurors should ignore the comment about what happened in the basement because it was irrelevant. As for the transcripts, the court explained that it did not have "realtime" or the ability to "play it right back." Trial Tr. 69, Oct. 2, 2000.

The next note requested the exhibits and asked whether there was a typographical error in the charge that referred to the petitioner placing his finger in AT's vagina. The jurors noted that the AT referred to the petitioner's penis, not his finger. The trial court provided the exhibits and responded that the charges were as written in the jury instructions. The court again said that there were no transcripts available. Trial Tr. 72-73, Oct. 2, 2000.

In their third note, the jurors asked why they could not review the transcripts of AT's testimony. The note states, "There is some disagreement among the jurors as to Ms. Tucker's testimony regarding the pencil and other matters." Pet'r Br. in Mich. Ct. App. Ex. D, Jury Note. The trial court responded that it did not have a transcript available, that it usually took four to six weeks to prepare one, and that it was difficult for the court reporter to read from his notes. The court then asked the jurors to use their collective memories and decide issues on which they could agree.

Deliberation continued to the next day, and the jury sent the judge another note stating the jury's "collective memory is uncertain" and asking two questions. Trial Tr. 3-4, Oct. 3, 2000. First, the jurors asked, "The third charge refers to 'pencil/anal.' However, our collective memory is uncertain as to Ms. Tucker's testimony and whether she said 'anal' versus 'vaginal' penetration with

the pencil. Is this difference in where (i.e. what body part) the penetration occurred significant relative to our verdict?" Pet'r Br. in Mich. Ct. App. Ex. E, Jury Note. The judge responded that the jury had to decide the defendant's guilt beyond a reasonable doubt. Next, the jurors asked, if they could find the defendant guilty of three charges but remain undecided on the fourth. The judge answered, "you are the jury if that's what you have concluded you can do that." Trial Tr. 4, Oct. 3, 2000. A short time later, on October 3, 2000, the jury returned its verdict acquitting the petitioner of the fourth count charging digital/vaginal penetration and convicting him of the other three counts. The petitioner was sentenced to concurrent terms of eighty-five to two hundred forty months in prison.

On October 13, 2000, after the trial concluded, the petitioner learned from his sister that the 1996 car accident involving AT resulted in multiple pelvic fractures and vaginal bleeding. He notified his trial counsel, who then ordered the medical reports containing information about these injuries, asked a physician to review the records, and began drafting a motion for a new trial based on newly discovered evidence.

The petitioner subsequently retained a new attorney, who filed a motion for a new trial on the grounds that trial counsel was ineffective by failing to obtain the medical records from the car accident before trial, and the trial court erred in denying the jury's request to provide transcripts or re-read testimony. At oral arguments on the motion, the trial court denied relief on the issue involving transcripts, but the court agreed to hold an evidentiary hearing on the petitioner's ineffective assistance of counsel claim.

On August 29, 2001, the trial court held the evidentiary hearing. Testimony was taken from John Bain (trial counsel), Dr. Norma Inocencio, and Lorna and Stuart Timmerman (the petitioner's

sister and brother-in-law). Mr. Bain testified that he was aware of AT's car accident very early in the litigation. He knew that AT spent significant periods of time in the hospital but he did not request the medical records related to the accident until after the guilty verdict. He explained that he did not request the medical records beforehand beacuse he did not think they were relevant, as he was unaware of any vaginal injuries in the accident. Mr. Bain testified that the Tucker family believed the sexual abuse had been committed by AT's maternal grandfather, Herman.

Mr. Bain testified that he attempted to retain a doctor to dispute Dr. Inocencio's findings. He called and wrote to Dr. Stephen Guertin and sent him a copy of Dr. Inocencio's report. Mr. Bain never received a response from Dr. Guertin, and he therefore concluded that Dr. Guertin did not believe he could be of any assistance. Mr. Bain also spoke with and sent Dr. Inocencio's report to a Dr. Goldsmith. Mr. Bain made several attempts to reach Dr. Goldsmith but received no response. He again concluded that Dr. Goldsmith could be of no assistance. Mr. Bain finally attempted to retain a Dr. Church, a pediatrician at Ford Hospital. Mr. Bain discussed Dr. Inocencio's report with Dr. Church over the telephone and asked whether there was any other way of explaining the penetration or absence of a hymen. Dr. Church responded that the injury could be the result of being impaled on a picket fence. Dr. Church told Mr. Bain that there was no other way such injuries could have occurred.

Not having subpoenaed or read the medical records before trial, Mr. Bain stated that he did not know about the pelvic and vaginal injuries until after the trial was over. Within an hour of learning about these injuries, Mr. Bain contacted the prosecutor to discuss the possibility of a new trial. He also obtained the records from Mt. Clemons General Hospital and tried to procure the records from Children's Hospital, although he was unable to obtain those records. Mr. Bain hired

Dr. William Floyd to review the records. He attempted to contact Dr. Inocencio to find out whether the information about the pelvic and vaginal injuries would change her opinion. However, she never returned his calls. Mr. Bain testified that had he known of the vaginal bleeding, he would have gotten the medical records and used them at trial.

Dr. Inocencio testified at the hearing that she noticed a number of scars on AT during her examination and asked AT's mother about them. AT's mother told Dr. Inocencio that AT had been in a car accident that caused her to be in a coma for about a month. Dr. Inocencio stated she was never told about the vaginal bleeding prior to her examination of AT, but she may have been told about the fractured pelvis. Dr. Inocencio did not review the medical records from the accident before the examination. She also testified that a doctor treating a patient with vaginal bleeding might insert a finger into the vagina as part of the examination to determine the extent of the injuries and that gauze or padding might also be inserted.

On cross-examination by the prosecutor, Dr. Inocencio testified that after the trial she reviewed AT's medical records from Mt. Clemens General Hospital, where AT was treated briefly after the car accident before being transferred to Children's Hospital for a two-month stay. She stated, "I don't think you would see such a hymen in an accident, described in a motor vehicle accident such as this child had because the hymen is a very internal organ; that unless it had been penetrated it would not show what it is, you know." Ev. Hr'g Tr. 58, Aug. 29, 2001. She also testified that the records from the accident indicated "good sphincter tone for the anus," Ev. Hr'g Tr. 61, Aug. 29, 2001, which tended to contradict her findings of deep fissures in the anal tissues Dr. Inocencio described in her report read into the record at trial. Furthermore, the medical reports from the accident described an injury to AT's right labia majora, although Dr. Inocencio's

examination of AT revealed injury to the left labia majora. However, AT was at Mt. Clemons General Hospital for only a few hours before being transferred to Children's Hospital. Dr. Inocencio did not review the records from Children's Hospital, where AT was treated for two months.

Stuart Timmerman, the petitioner's brother-in-law, testified that he and other family members told Mr. Bain about AT's pelvic injuries in 1999. "We talked about the fact that she was in a coma for an extended period of time, along with [the petitioner] and that she had had some severe pelvic trauma and that she had experienced a period or early on in Children's [Hospital] at least, of severe vaginal bleeding." Ev. Hr'g Tr. 72, Aug. 29, 2001. Mr. Timmerman stated that the family asked Mr. Bain to obtain the medical records. Lorna Timmerman, the petitioner's sister, testified similarly.

The petitioner's new attorney also deposed Dr. Stephen Guertin, medical director at Sparrow Regional Children's Center. Dr. Guertin reviewed the photographs of AT taken at Care House and testified that AT's hymen appeared completely normal. The only thing even remotely suspicious was "a little bit of narrowing at about the three o'clock position." Guertin Dep. Tr. 14-15, Sept. 17, 2001. Dr. Guertin stated that "an irregular hymen is a normal thing," but that the narrowing could also have been caused by trauma. "It could be a penis, it could be an instrument, it could be a finger, it could be a waterskiing accident, it could be any other form of intrusion or extrusion." *Id.* at 17. Dr. Guertin noted a "sort of crinkly skin area on the left labia majora," which he stated is often caused by chaffing or dampness and could be a symptom of a disease known as lichen sclerosus et atrophicus. He stated that the finding did not suggest sexual trauma. Dr. Guertin also stated that AT's anus was "completely normal looking." *Id.* at 18. "There aren't any lacerations, tears, fissures, scars, skin tags. There's nothing to suggest that the child has suffered anal trauma." *Ibid.*

Dr. Guertin further testified that the narrowing in the hymen could easily have been caused by the car accident:

> In this particular child she was involved in a traffic accident where there was pelvic injury. There was blood coming from the vagina itself, and she actually had an exploration done of her vagina in Mount Clements. To explore the vagina you have to stick your finger across the hymen into the vagina and feel the walls of the vagina feeling for a shard, a bone, or a free edge of bone. In addition, she had a second examination done and also had vaginoscopy done. I believe those were done at Children's Hospital of Michigan. In each of those cases it entails the insertion of something across the hymen into the vagina to look for injury. In addition, you have the pelvic injury itself, and certainly pelvic injuries have been associated from accidents with lacerations or injuries of the vulva. So you actually have a situation here where grown adults were sticking their fingers into her vagina to feel for bone. To do that they have to go across the hymen. And they also stuck instruments across the hymen in order to look in the vagina.

*Id.* at 28-29.

The trial court denied the petitioner's motion in a written opinion and order, reasoning as follows:

> To establish ineffective assistance of counsel, defendant must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; <u>and</u> (2) such representation so prejudiced him as to deprive him of a fair trial. (emphasis added) *People v. Pickens*, 446 Mich. 298, 302-303; 521 NW2d 797 (1994). *See also Strickland v. Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).
>
> At the *Ginther* hearing, trial counsel John Bain ("Bain") testified that his representation of defendant had commenced in August 1999 and that "very early on" he had learned that the victim had been involved in an automobile accident in August 1996. *8-29-01 Tr. at 8-9, 27.* However, it was not until October 13, 2000 – after defendant had been convicted – that Bain first learned that the victim may have sustained some vaginal injuries in the accident. *Id. at 23-25, 29, 33.* Bain was told about the possible injuries by defendant while defendant was in jail. *Id.* He testified that he immediately contacted the prosecution, spoke with defendant's family, and had defendant sign a medical release so that he could obtain the pertinent medical records. *Id. at 31.* At the sentencing hearing, Bain informed the Court that he had first learned about the possible injuries on October 13, 2000. *Id.* Defendant had been standing next to him at the time and had not disagreed with his statement to the Court. *Id. at 31-32.* Moreover, Bain had had the family submit notes to him prior to trial regarding the chronology of events and none of the notes had mentioned a

-12-

pelvic fracture, vaginal bleeding, or vaginal laceration. *Id. at 35.* Bain stated that he would have acquired the records prior to trial if he would have learned about the possible injuries at such time. *Id. at 32.*

Based on the totality of evidence, the Court is not convinced that Bain's performance had fallen below an objective standard of reasonableness. *Pickens, supra.* The Court opines that Bain should not have reasonably been expected to order the medical records prior to trial inasmuch as there had been no indication that the victim may have sustained vaginal injuries from the automobile accident. Further, the Court is satisfied that Bain had acted properly after he first learned about the possible injuries. Since defendant has failed to meet his burden of establishing the first part of the mandatory two-tier test under *Pickens, supra*, the Court need not consider whether he has fulfilled his burden as to the second part thereof.

Order Denying Motion for New Trial, No. 2000-180-FC, at 1-3 (Nov. 30, 2001) [dkt # 19 at 40-42].

The petitioner filed a direct appeal in the Michigan Court of Appeals raising the following claims:

I.    The trial court reversibly erred in refusing the jury's reasonable requests for the rereading of trial testimony, in violation of the right to due process and a fair trial.

II.    Defense counsel was ineffective for failing to have Dr. Inocencio's report and the photographs taken during her examination reviewed by another doctor, for failing to obtain the medical records from [AT]'s automobile accident, for conceding that sexual abuse occurred, for eliciting testimony that [AT]'s previous statements and testimony were consistent with her trial testimony, when they were inconsistent, and for failing to impeach witnesses with prior inconsistent testimony.

III.    Reversal is required where the court permitted highly prejudicial testimony that Mr. Tucker was a cross dresser over defense objection, without giving a cautionary instruction, despite the court's intention to do so, and, in the alternative, defense counsel was ineffective for failing to object to the failure to give a cautionary instruction.

IV.    The cumulative effect of these errors denied due process and the right to a fair trial.

The Michigan Court of Appeals affirmed the petitioner's conviction in a *per curiam* decision.

*People v. Tucker*, No. 232094, 2003 WL 734168 (Mich. Ct. App. Mar. 4, 2003). The petitioner filed

-13-

an application for leave to appeal in the Michigan Supreme Court. On September 25, 2003, the

Michigan Supreme Court denied leave to appeal because it was not persuaded that the questions

presented should be reviewed. *People v. Tucker*, 469 Mich. 903, 669 N.W.2d 816 (2003).

The petitioner thereafter filed through counsel the present habeas petition, asserting the

following claims as grounds for relief:

I.   The trial court reversibly erred in refusing the jury's reasonable requests for
     the rereading of trial testimony, in violation of the right to due process and
     a fair trial, and defense counsel was ineffective for failing to object.

II.  Defense counsel was ineffective for failing to have Dr. Inocencio's report
     and the photographs taken during her examination reviewed by another
     doctor, for failing to obtain the medical records from [the complainant's]
     automobile accident, for conceding that sexual abuse occurred, for eliciting
     testimony that [the complainant's] previous statements and testimony were
     consistent with her trial testimony, when they were inconsistent, and for
     failing to impeach witnesses with prior inconsistent testimony.

III. The petition should be granted where the court permitted highly prejudicial
     testimony that Mr. Tucker was a cross dresser over defense objection,
     without giving a cautionary instruction, despite the court's intention to do so,
     and, in the alternative, defense counsel was ineffective for failing to object
     to the failure to give a cautionary instruction.

IV.  The cumulative effect of these errors denied due process and the right to a
     fair trial.

The respondent alleges that the petitioner did not fairly present all his claims to the state

court as federal constitutional claims. The respondent argues in the alternative that the petitioner's

claims are procedurally defaulted, are not cognizable on habeas review, or lack merit.


## II.

The respondent first argues that the petitioner did not fairly present his first, third, and fourth

claims to the state courts as federal constitutional claims. The Court disagrees.

The doctrine of exhaustion of state remedies requires state prisoners to "fairly present" their claims as federal constitutional issues in the state courts before raising those claims in a federal habeas corpus petition. *See* 28 U.S.C. § 2254(b)(1)(A) and (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *McMeans v. Brigano*, 228 F.3d 674, 680-81 (6th Cir. 2000); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The exhaustion requirement is satisfied if a prisoner invokes one complete round of the state's established appellate review process, including a petition for discretionary review to a state supreme court. *O'Sullivan*, 526 U.S. at 845. A prisoner "'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Carter v. Bell*, 218 F.3d 581, 607 (6th Cir. 2000); *see also Prather v. Rees*, 822 F.2d 1418, 1420 (6th Cir. 1987) (holding that "[o]rdinarily, the state courts must have had the opportunity to pass on defendant's claims of constitutional violations"). A Michigan petitioner must present each ground to both Michigan appellate courts before seeking federal habeas corpus relief. *See Mohn v. Bock*, 208 F. Supp. 2d 796, 800 (E.D. Mich. 2002); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The petitioner bears the burden of showing that state court remedies have been exhausted. *Rust*, 17 F.3d at 160.

The Court is satisfied that the petitioner's state court briefs put the state courts on notice that he was raising federal constitutional issues. The petitioner's briefs in both state courts and here phrase the issues in virtually identical terms. The petitioner raised his first claim in state court under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. He raised his third claim in state court under the Fifth and Fourteenth Amendments to the Constitution, and he supported his third and fourth claims with federal case law. The petitioner phrased his claims in

constitutional terms or in terms sufficiently particular to bring to mind specific constitutional rights. He also alleged facts well within the mainstream of constitutional law. The Court, therefore, must reject the respondent's exhaustion defense.

III.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ( internal quotes omitted)). Additionally, this

-16-

Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application
must also be unreasonable.

*Id.* at 409, 410-11.  *See also Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007); *King v. Bobby*, 433

F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v.*

*Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).  "If the federal court finds that, viewed

objectively, the state court has correctly identified the governing legal principle from the Supreme

Court's decisions but unreasonably applied that principle to the facts of the prisoner's case, it may

grant the writ." *Ege v. Yukins*, 485 F.3d 364, 371 (6th Cir. 2007) (quoting *Millender v. Adams*, 376

F.3d 520, 523 (6th Cir. 2004)).

A.

Of the four claims presented, the Court finds that only one warrants habeas relief: that trial

counsel's failure to investigate the circumstances of AT's automobile accident and obtain medical

records of her treatment amounted to substandard performance and resulted in prejudice to the

petitioner's defense in violation of the Sixth Amendment.  The petitioner alleges that his trial

attorney (1) failed to have Dr. Inocencio's report and photographs reviewed by another doctor,  (2)

failed to obtain the medical records from the complainant's automobile accident, (3) conceded that

sexual abuse occurred, (4) elicited testimony that the complainant's previous statements and

testimony were consistent with her trial testimony, and (5) failed to impeach witnesses with prior

inconsistent testimony.  The trial court found that trial counsel's performance was not deficient and

did not reach the prejudice issue; the Michigan Court of Appeals agreed and also concluded that the

petitioner did not suffer prejudice.

The Supreme Court has "emphasized that the Sixth Amendment right to counsel exists 'in

order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell*, 506 U.S. 364, 368

(1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). "In *Strickland*, [the Court] identified the two components to any ineffective-assistance claim: (1) deficient performance and (2) prejudice." *Id.* at 369. *See also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

To determine whether defense counsel's performance fell outside the wide range of "prevailing professional norms" in this case, the Court will evaluate the cited instances of ineffective

assistance from trial counsel's point of view at the time. In so doing, the Court finds that only the petitioner's second claim has merit, and that claim will be discussed first.

1.

The petitioner's second claim is that Mr. Bain failed to perform effectively because he did not obtain the complainant's medical records from her automobile accident. The petitioner contends that the medical records would have supported a defense that injuries from the car accident or treatment for those injuries caused the abnormalities observed by Dr. Inocencio. The trial court addressed this argument in ruling on the petitioner's motion for a new trial. The trial court concluded that Mr. Bain was not ineffective for failing to obtain the records because he did not actually know about the vaginal injuries until after the trial concluded. The Michigan Court of Appeals affirmed this decision.

The question of when trial counsel learned of the exact injuries AT had suffered in the automobile accident – specifically the injury to her pelvis and vagina – was the subject of a dispute at the evidentiary hearing. Trial counsel testified that he did not learn of the injuries until after conviction, whereas the petitioner's sister and brother-in-law testified that they discussed the complainant's medical records with defense counsel and mentioned AT's pelvic trauma and severe vaginal bleeding before trial. The trial court chose to accept trial counsel's chronology, and the state court of appeals deferred to the trial court's resolution of the credibility dispute. The trial court's implicit finding that defense counsel was credible is presumed to be correct unless the petitioner can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court finds no basis to upset the state courts' factual finding, and therefore the Court will examine the issue

based on the premise that trial counsel did not have actual knowledge of AT's pelvic/vaginal injuries until shortly after trial.

The Michigan Court of Appeals concluded that the petitioner's trial counsel did not perform deficiently precisely because he did not have actual knowledge of AT's pelvic injuries until after the trial ended:

> [D]efendant contends that defense counsel was ineffective for failure to produce specific medical evidence to suggest that an automobile accident, not defendant's conduct, resulted in the victim's abnormal medical evaluation. During the *Ginther* hearing, trial counsel testified that he did not learn about the victim's pelvic injuries, suffered in the automobile accident, until after the trial concluded. He testified that it was his understanding that her injuries did not involve the pelvic area. In contrast, two of defendant's family members testified that trial counsel was told during the early stages of representation that the accident caused the victim to suffer "severe vaginal bleeding." A medical expert testified that the victim's post-accident treatment may have caused any physical "abnormalities" diagnosed by the prosecution's expert.
>
> *We agree that trial counsel's performance would have been deficient if he knew that the victim suffered pelvic injuries in the car accident and failed to somehow incorporate those facts into a defense.* Thus, resolving this question *necessarily turns on whether trial counsel knew, before the trial, that the victim suffered pelvic injuries during the accident.* After the *Ginther* hearing, the trial court specifically found that trial counsel did not learn about the pelvic injuries until after the trial. Because the witnesses' testimony was in conflict, resolution of this issue turned on the witnesses' credibility. Witness credibility issues are for the trier of fact to decide, and "we will not resolve credibility issues anew on appeal." *See People v. Milstead*, 250 Mich. App. 391, 404, 648 N.W.2d 648 (2002). Because there was ample evidence supporting the trial court's finding, we are not persuaded that the finding was clearly erroneous. *LeBlanc*, *supra* at 579, 640 N.W.2d 246. Accordingly, we reject defendant's contention that trial counsel was deficient.

*Tucker*, 2003 WL 734168, at *4 (emphasis added).

As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotes and citations omitted). However, "a lawyer's acts and omissions must be judged on the basis of what he knew, *or should have known*, at the time his tactical choices were made and implemented." *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (emphasis added). It is equally true that "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

"Strategic" choices that have no hope of succeeding, are made without adequate investigation or preparation, or actually imperil the defendant's case cannot be considered "sound."

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. "Only choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity. . . . [A] decision . . . cannot be accord[ed] the normal deference to strategic choices [where] it was uninformed." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3rd Cir. 2006). An obviously defective choice is "not a reasonable strategic decision entitled

-22-

to deference." *Moss v. Hoffbauer*, 286 F.3d 851, 865 (6th Cir. 2002) (finding that defense counsel's reliance on the cross-examination of an eyewitness by a co-defendant unreasonable when the two defendants' interests were not aligned).

Contrary to the state court of appeals' view, federal law requires that counsel's performance be assessed not only on the basis of what he actually knew at the time, but also what he should have known if he had conducted a reasonable investigation. The Supreme Court made that point quite clearly in *Wiggins,* 539 U.S. at 527-28, a death penalty case, in which the Court held that the state court of appeals unreasonably applied *Strickland*'s governing principles in rejecting the petitioner's ineffective assistance claim because the state court's conclusion that counsel's performance was within professional norms was objectively unreasonable. Counsel did not present evidence at the penalty phase on the petitioner's personal background, which might have been a valid strategic choice under some circumstances. But counsel had failed to make a reasonable investigation into the petitioner's social history. *Ibid.* (noting that under *Strickland,* "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation") (citation and internal quotation marks omitted). This failure reasonably to investigate, in turn, rendered the state court's deference to counsel's strategic decision not to present mitigating evidence of the petitioner's social history objectively unreasonable as well. *Ibid.* (stating that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

The Court concludes, therefore, that the state court's resolution of this claim was contrary to federal law. The state court determined that the only way trial counsel's failure could constitute

ineffective assistance was if he had actual knowledge before trial of the vaginal injuries AT sustained in the car accident. *Tucker*, 2003 WL 734168, at *4 (asserting that "resolving this question necessarily turns on whether trial counsel knew, before the trial, that the victim suffered pelvic injuries during the accident"). This is an incorrect statement of federal law. A criminal defense attorney is required to do more than act reasonably based on the information actually in his possession. He also is required to conduct a reasonable investigation. *Strickland*, 466 U.S. at 690-91. "[A] lawyer's his tactical choices were made and implemented." The state court failed to "consider not only the quantum of evidence already *known* to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527 (emphasis added); *Johnson v. Bell*, 344 F.3d 567, 577 (6th Cir. 2003) (considering whether "counsel *should have known* that further inquiry" was needed (emphasis added)). Its decision therefore is contrary to federal law.

There is no dispute that trial counsel had actual knowledge of the automobile accident and the fact that it resulted in serious injuries to AT. Should trial counsel have obtained the medical records from the car accident before trial as part of a reasonable investigation in the case? Mr. Bain answered that question himself during his cross-examination of Dr. Eastman and his argument to the jury. The petitioner's trial counsel attempted to call into doubt the doctor's conclusion that abuse occurred by pointing to the doctor's failure to review the medical records. Ironically, trial counsel himself had failed to review those records. His decision to comment on the content of the records, a decision made without reviewing the records, is not sound trial strategy entitled to deference. Mr. Bain plainly knew the importance of these records since he specifically argued the importance of the records to the jury: "And I suggest to you might that not be important to review

-24-

reports?  Do we know that something of that nature didn't happen during the course of the accident?"  Trial Tr. 39-40, Oct. 2, 2000.  Of course, the only way to have known for sure was to obtain and read the medical records.  The record in this case discloses no possible detriment to the defense that could have resulted from obtaining them.  No reasonable professional judgment can support the limitation on investigation.  The failure to obtain those medical records as part of the pretrial investigation was not reasonable, and the decision to proceed to trial without them amounted to substandard performance.

The state court also concluded that, even if the petitioner's trial counsel was deficient, the petitioner was not prejudiced:

> Moreover, we note that developing the possibility that the accident could have resulted in physical conditions resembling those commonly associated with sexual abuse would only have presented an alternative explanation for the complainant's physical condition.  It would not have eliminated the possibility of sexual penetration, nor would it have called into question the victim's compelling testimony against defendant.  Accordingly, we cannot conclude that, but for trial counsel's failure to refute the prosecution's expert testimony, defendant would not have been convicted.  *Snider*, *supra* at 423-424, 608 N.W.2d 502.  Consequently, we reject defendant's contention that counsel was ineffective as to this issue.  *Id.*

*Tucker*, 2003 WL 734168, at *4.  This articulation of the prejudice standard also is an incorrect statement of federal law.  The standard for determining prejudice is not whether effective advocacy would have "eliminated the possibility" that the defendant committed the crime or that the petitioner "would not have been convicted."  The petitioner is required to show "a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694 (emphasis added).

Applying the correct standard, this Court has little trouble concluding that it is reasonably probable that a different result would have been reached if the jury had know of AT's injuries as described in the medical records following the automobile accident. This case involved a substantial delay in the report of the alleged sexual abuse. The abuse did not come to light until it was related by the petitioner's wife, with whom the petitioner was then involved in a contentions divorce that included a dispute over visitation rights. The opportunity to manipulate the testimony of AT, a child, certainly existed, and AT's mother no doubt had a motive to do so. If the jury had a doubt that sexual penetration had occurred, it likely was dispelled by the physical evidence related by Dr. Easton. The introduction of the medical records that provided a logical alternative explanation for the physical findings that Dr. Easton argued were consistent with sexual abuse gives rise to a reasonable probability that the jury would have found reasonable doubt in AT's testimony. The jury's inability to consider that evidence undermines confidence in the outcome of the state proceedings.

Moreover, the petitioner's trial attorney pointedly questioned Dr. Eastman at trial whether it would be important to examine the medical records following the car accident to determine if there were an injury to the vaginal area, and in closing arguments he specifically stated, "And I suggest to you might that not be important to review reports? Do we know that something of that nature didn't happen during the course of the accident?" Trial Tr. 39-40, Oct. 2, 2000. That argument provoked the prosecutor to observe that the petitioner never obtained the records either, suggesting to the jury that the records did not contain anything supporting the defense. As it turns out, of course, the medical records soundly rebut that contention. The petitioner has presented evidence that the doctors treating AT after the car accident inserted fingers and medical instruments into her

vagina to determine the cause of the vaginal bleeding. Guertin Dep. Tr. 28-29, Sept. 17, 2001. The failure to obtain those records before trial foreclosed that argument, left the jury with no alternative explanation for the injuries to AT's genitals, and deprived the petitioner of valuable defense evidence that could have changed the result of the trial.

The Court must conclude, therefore, that the state courts' decisions that trial counsel's performance was reasonable and that no prejudice resulted are contrary to federal law as established by Supreme Court precedent. The petitioner is entitled to habeas relief on this claim.

2.

The Court can find no deviation from proper practice in trial counsel's pursuit of an expert to review Dr. Norma Inocencio's findings. Dr. Inocencio examined AT after AT reported the alleged sexual abuse to her mother and concluded that abnormalities in AT's genital area were consistent with sexual abuse. Her findings were recounted in a report which was read and explained to the jury through the testimony of Dr. Jay Eastman.

The petitioner alleges that his trial attorney should have asked other physicians to review Dr. Inocencio's findings. According to the petitioner, if defense counsel had done so, he would have received a medical opinion critical of Dr. Inocencio's findings, and he would have learned that AT's vagina and anus were normal with the possible exception of a narrowed hymen, which could have been caused by injuries she sustained in an automobile accident or by treatment she received for the injuries. The petitioner's argument is based on the testimony of Dr. Stephen Guertin, whom the petitioner's current attorney deposed after trial. Dr. Guertin opined on the basis of photographs taken of the complainant during Dr. Inocencio's examination that the AT's vagina and anus were normal and that a narrowed hymen was the only suspicious area.

A defense attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Nonetheless, "[w]here counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir.1984)). When the failure to investigate key evidence is the result of negligence, not strategy, the failure may not be excused. *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992).

The petitioner's trial attorney testified at the evidentiary hearing that he placed a telephone call to Dr. Guertin, wrote to him, and sent him Dr. Inocencio's report. He never received a response from the doctor, and he concluded that Dr. Guertin thought he could be of no help. Mr. Bain also spoke with Dr. Goldsmith, who had been helpful in cases like this one. Mr. Bain then sent Dr. Inocencio's records to Dr. Goldsmith, but when Dr. Goldsmith did not respond after several attempts to reach him, Mr. Bain concluded that Dr. Goldsmith thought he could not help the defense. Mr. Bain attempted to retain a third physician, Dr. Church, who was a pediatrician at Ford Hospital. Mr. Bain discussed Dr. Inocencio's report with Dr. Church over the telephone and asked her whether there was any other way of explaining the penetration or absence of a hymen. Dr. Church responded that the injury could be the result of being impaled on a picket fence, and Mr. Bain apparently concluded – reasonably – that this testimony would not be helpful.

The record demonstrates that the petitioner's trial attorney pursued attempts to obtain expert assistance in order to attack Dr. Inocencio's report. He made a reasonable investigation by contacting three physicians and either discussed Dr. Inocencio's findings with them or sent them Dr. Inocencio's report. His determination not to call a physician as an expert in light of the lack thereof responses and his conversation with Dr. Church was a reasonable decision.

The Michigan Court of Appeals agreed with the trial court that counsel made reasonable efforts to explore the possibility of refuting the prosecution's expert witness. The court of appeals concluded that trial counsel's performance was not deficient in his futile pursuit of a physician expert, and the Court finds that this aspect of the state court's decision was not an unreasonable application of *Strickland*.

3.

The petitioner alleges next that his trial attorney performed deficiently when he conceded that sexual abuse occurred. During opening statements, trial counsel told the jury that "it's only fair to say that something happened to this young lady. That there was a physical abuse, sexual abuse." Trial Tr. 12, Sept. 29, 2000. However, the petitioner's brief contains no argument on the claim that this admission constitutes ineffective assistance. The Court concludes, as did the Michigan Court of Appeals, that the petitioner has abandoned his claim by failing to present any argument or authority in support of this claim. *See Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003) (stating that, because the habeas petitioner failed to advance any argument in support of a finding of "cause and prejudice" for his procedural default, the court considered the argument abandoned) (citing *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000)).

4.

The petitioner next alleges that trial counsel should have impeached the complainant and her mother in regard to the dates on which the sexual abuse allegedly occurred. The petitioner alleges that the victim's mother claimed the sexual abuse occurred from the spring of 1995 to December of 1998, whereas the victim testified at the preliminary examination that the charged events occurred before her automobile accident in August of 1996. The court of appeals rejected this claim. The victim testified at trial that she could not remember the date of the incident in question. The court noted that "aggressively impeaching the victim could have had a negative result – increasing the jury's sympathy for her, rather than drawing attention to the discrepancies." *Tucker*, 2003 WL 734168, at *5.

This Court concludes that the state court's decision on this issue is nether contrary to nor an unreasonable application of *Strickland* to the facts in this case. The decision to impeach the victim was a strategic choice, which is entitled to deference. Moreover, the petitioner has not identified any instance in which AT contradicted herself. Nor has the petitioner identified any such contradiction by AT's mother. The jury was made aware of the discrepancies between the testimony of two witnesses and the fact that the complainant could not remember whether she told others people the same things she told the jury. The Court does not believe that the result of the proceeding would have been different if defense counsel had persisted in pointing out inconsistencies in the testimony. Habeas relief is not warranted on this ineffective assistance of counsel claim.

## B.

The petitioner also argues that he was denied a fair trial because the trial court refused to honor the jury's requests for a re-reading of trial testimony. The state court held that the petitioner forfeited this issue because the petitioner did not object to the trial court's responses to the jury's requests. The court went on to analyze the claim for plain error and prejudice and concluded:

> Ordinarily, the decision whether to allow a jury to examine transcript testimony is left to the sound discretion of the trial court. *People v. Davis*, 216 Mich. App. 47, 56, 549 N.W.2d 1 (1996). MCR 6.414(H) states in pertinent part
>
>> If, after beginning deliberation, the jury requests a review of certain testimony or evidence, the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may order the jury to deliberate further without the requested review, so long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.
>
> Here, it appears that the jury's requests to review the victim's testimony were reasonable. The trial court's commentary when refusing to provide the transcripts certainly implied that the jurors would not be able to review the testimony. Thus, even though the trial court stopped short of stating that review of the transcripts could never take place, the trial court's instructions may have been plainly erroneous.
>
> However, even if plainly erroneous, defendant bears the burden of proving that his substantial rights were prejudiced by the unpreserved error. *Carines, supra* at 763, 597 N.W.2d 130. Here, there is no indication that the lack of a transcript of the victim's testimony affected the outcome of the proceedings.
>
> One of the areas of apparent concern was whether there was any testimony supporting the charge related to digital-vaginal penetration. Ultimately, the jurors resolved this concern by acquitting defendant on the charge. Thus, defendant suffered no harm.
>
> The other area of apparent concern was whether the victim's testimony supported the charge of pencil-anal penetration. The notes suggest that one of more jurors recalled the victim's testimony as suggesting pencil-vaginal penetration, which was inconsistent with the charge. The victim testified that defendant "shoved it [a pencil] up my private." Our review of the victim's testimony reveals that she used the word "private" broadly enough to include either "pencil-anal" or "pencil-vaginal" penetration. in light of the victim's testimonial ambiguity, we are not persuaded that a transcript of the victim's testimony would have resolved any possible confusion. At the very least, defendant has not satisfied his burden of demonstrating that the

error, if any, in not providing the jury a transcript of the victim's testimony affected the outcome of the proceedings.

*Tucker*, 2003 WL 734168, at *1.

The respondent argues that this claim is procedurally defaulted. The doctrine of procedural default provides:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner files an untimely appeal, *ibid.*, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection or file a motion for a directed verdict. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202-03 (6th Cir. 1996). Application of the cause and prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim.

*Coleman*, 501 U.S. at 729-30.  "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar."  *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996).

If the last state court from which the petitioner sought review affirmed the conviction both on the merits, and, alternatively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *Abela v. Martin*, 380 F.3d 915, 922-24 (6th Cir. 2004); *Rust*, 17 F.3d at 161.  If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

In this case, it appears that a state procedural rule was in place during the relevant time, namely that a defendant must object at trial to preserve issues for appellate review.  The contemporaneous objection rule was firmly established at the time of the petitioner's trial.  *See People v. Carines*, 460 Mich. 750, 761-64, 597 N.W.2d 130, 137-38 (1999); *People v. Grant*, 445 Mich. 535, 546, 520 N.W.2d 123, 128 (1994).  Therefore, the contemporaneous objection rule is an adequate and independent state ground on which to deny relief.

It also appears that the Michigan courts actually enforced the procedural rule in this case. The last state court to issue a reasoned opinion on these claims, the Michigan Court of Appeals, held that the claims were not preserved "because defendant did not object to any of the trial court's

responses to the notes from the jury." *Tucker*, 2003 WL 734168, at *1. The court then reviewed the unpreserved claims for plain error, concluding that the petitioner was not prejudiced by the trial court's refusal to provide the jury with transcripts. Plain error review does not constitute a waiver of state procedural default rules. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

Because it appears that the petitioner has procedurally defaulted these claims, the remaining question is whether the petitioner has demonstrated "cause" for the failure to adhere to the procedure in place, and "prejudice" that flows the application of the rule. *See Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006). Ineffective assistance of counsel may serve as "cause" for a procedural default if it rises to the level of a constitutional violation. *Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir. 2002). In fact, a "claim of ineffective assistance of counsel . . . can serve as both cause and prejudice, excusing a procedural default in an underlying substantive claim." *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). The petitioner alleges that his trial attorney was ineffective for failing to object to the trial court's responses to the jury's request for transcripts.

As noted above, the two-prong test set forth in *Strickland v. Washington* governs claims of ineffective assistance of counsel, and it requires a showing of both deficient and prejudice. *Strickland*, 466 U.S. at 687. The Michigan Court of Appeals concluded that the petitioner was not prejudiced by the trial court's refusal to provide the jury with transcripts. This Court concludes that the Michigan Court of Appeals' decision is consistent with United States Supreme Court precedent and constitutes a reasonable application of federal law to the facts. It appears that the jury asked to hear AT's testimony again to resolve confusion over the charge contained in court four of the information, although the jury did mention "some disagreement among the jurors as to [AT]'s testimony regarding the pencil and other matters." Pet'r Br. in Mich. Ct. App. Ex. D, Jury Note.

Nonetheless, the record suggests that the jurors resolved their concerns about the testimony supporting count four in the petitioner's favor, even without the transcripts. The jury also expressed confusion about the complainant's testimony on count three, which alleged that the petitioner put a pencil in her anus. However, the transcript likely would not have resolved these concerns because the complainant, as noted by the state court, used the word "privates" very broadly to mean both anus, vagina, and mouth. The following exchange took place during her testimony:

> Q. What happened next?
> A. He put his privates in my privates.
> Q. Okay. And which privates are we talking about?
> A. Front, back, and mouth.
> . . .
> Q. Okay. And who had the pencil?
> A. My dad.
> Q. What did he do with the pencil?
> A. Shoved it up my private.

Trial Tr. 64, 67-68, Sept. 29, 2000. Because this testimony equally supports a finding that the petitioner inserted a pencil into the complainant's vagina or anus, the transcript would not have assisted the jury in coming to a decision. The petitioner was therefore not prejudiced by counsel's failure to object. Although both elements of the *Strickland* test must be satisfied before a constitutional violation can be found, a court need not analyze the performance element if the petitioner fails to show prejudice. *See Baze v. Parker*, 371 F.3d 310, 321 (6th Cir. 2004). The petitioner cannot overcome his procedural default based on ineffective assistance of counsel.

A petitioner may overcome a procedural default in the absence of "cause and prejudice" upon a showing of actual innocence. *Lott v. Coyle*, 261 F.3d 594, 620 (6th Cir. 2001) (citing *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995), and *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). The miscarriage of justice exception applies in the extraordinary case where the habeas petitioner

demonstrates that the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. at 496. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. "[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. In other words, the petitioner must show "that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, __ U.S. __, __, 126 S. Ct. 2064, 2077 (2006).

The petitioner has made no such showing in this case. Consequently, a miscarriage of justice will not occur if this Court does not adjudicate the substantive merits of his claim regarding the transcripts. The petitioner's claim is procedurally defaulted and this Court will not review it on the merits.

## C.

The petitioner's third habeas claim is that the trial court erroneously admitted highly prejudicial testimony that the petitioner was a cross dresser. The petitioner contends that this evidence deprived him of his constitutional right to a fair trial and that the error was exacerbated by the trial court's failure to give a proper limiting instruction. He argues in the alternative that defense counsel was ineffective for failing to object to the lack of a cautionary instruction regarding the

evidence.  The Michigan Court of Appeals concluded that the trial court did not abuse its discretion in admitting the evidence, and it concluded that defense counsel's performance was not deficient.

Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).

The state appellate court reasoned the evidence of cross-dressing was part of an event that culminated in a threat by the petitioner to AT if she revealed that she saw him in women's clothing. The threats of abuse to AT's mother, the court found, was a pattern of threats to persuade AT to conceal incidents about which the petitioner did not want anyone to know.  The court of appeals held that the petitioner's "pattern of threatening the victim was certainly relevant to explaining the victim's delay in reporting the abuse."  *Tucker*, 2003 WL 734168, at * 2.  This reasoning is sound. The petitioner's alleged threats served to explain why the victim did not tell anyone about the petitioner's conduct until years after it occurred.  Moreover, the trial court offered to give a cautionary instruction stating that the petitioner's cross-dressing should not play a part in the jurors' decision.  The Court concludes that the decision to admit the evidence was not so fundamentally unfair as to deprive the petitioner of due process and that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

Nor did trial counsel's failure to insist on a cautionary instruction violate the petitioner's right to effective assistance of trial.  Although the trial court offered to give a cautionary instruction to the jury, it did not read the instruction.  The record does not explain defense counsel's subsequent

failure to insist on the instruction and his failure to object to the lack of an appropriate instruction. The petitioner argues that trial counsel was ineffective for failing to object to the lack of a cautionary instruction concerning evidence of his cross-dressing.

However, the petitioner admitted at trial that he was a cross-dresser, and he claimed that he went to a therapist to try to stop doing it. He also produced a clinical psychologist who testified that there is no connection between cross-dressing and criminal sexual activity with children. Because the psychologist's testimony on this issue was not contested, it is unlikely that the petitioner's cross-dressing was relevant to the jury's decision.

The Court concludes that trial counsel's failure to request an instruction on cross-dressing and his failure to object to the lack of such an instruction may have been a strategic decision and did not constitute deficient performance. The Court further concludes that the alleged deficiency did not prejudice the defense because it did not deprive the petitioner of a trial whose result is reliable. Therefore, the state court's conclusion was not an unreasonable application of *Strickland*.

### D.

The petitioner's fourth and final claim alleges that the cumulative effect of the errors set forth in his brief deprived him of due process and his right to a fair trial. This claim has no merit because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.), *opinion corrected on denial of reh'g*, 307 F.3d 459 (2002), *and cert. denied*, 538 U.S. 947 (2003). Therefore, it cannot be said that the state court's judgment was contrary to any Supreme Court decision so as to warrant habeas relief under the AEDPA.

## IV.

The Court finds that trial counsel rendered ineffective assistance in failing to obtain AT's medical records. The Michigan courts' decisions to the contrary were an unreasonable application of federal law as established by the Supreme Court. The petitioner's other claims lack merit. Nonetheless, he has established that he is in custody in violation of his federal constitutional rights. *See* 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus [dkt # 1] is conditionally **GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 23, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 23, 2007.

s/Felicia M. Moses
FELICIA M. MOSES